IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AMERICAN TRUST & SAVINGS BANK,                    OPINION and ORDER

                    Plaintiff,                              09-cv-474-wmc

          v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
BREMSER, SCHOMMER & MCHUGH, CPA'S, LLC and
BREMSER GROUP, INC.,

                    Defendants.

---

In this action for monetary relief, plaintiff American Trust & Savings Bank asserts five claims against defendants Philadelphia Indemnity Insurance Company, Bremser, Schommer & McHugh CPA's, LLC and Bremser Group, Inc., all of which relate to accounting functions undertaken by Bremser for a Wisconsin creamery. Jurisdiction is present under 28 U.S.C. § 1332 because the parties are completely diverse and there is more than $75,000 in controversy.

Before the court are the parties' cross motions for partial summary judgment on plaintiff's claims of professional negligence, negligent misrepresentation, intentional misrepresentation and breach of contract. Plaintiff contends that defendants' liability on these claims was litigated previously to jury verdict and final judgment against defendants, which precludes their relitigating the same issues here. Defendants dispute that the doctrine of issue preclusion applies and also contend that plaintiff cannot prove either causation or

1

reliance, essential elements of each of these claims.[1]

The court will deny both motions. Plaintiff has not shown that the issues it seeks to preclude were actually decided by the jury in the related state case. Thus, plaintiff is not entitled to invoke the doctrine of issue preclusion on those legal and factual issues. With respect to defendants' motion, there are genuine factual disputes regarding whether plaintiff can establish causation, making summary judgment for defendants improper. Fed. R. Civ. P. 56 (summary judgment appropriate only where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law.").

FACTS[2]

**A. The Parties**

Plaintiff American Trust & Savings Bank is an Iowa corporation with its principal

---

[1] Also before the court are plaintiff's motions to strike portions of Clifford Joe Cavitt's affidavits. Dkts. #56 and #64. These motions are quickly resolved. Plaintiff contends that Cavitt, as an attorney for defendants, is not a competent witness to lay foundation for engagement letters he attaches to his affidavits (dkts. #42 and #48) and, thus, the documents should not be considered by the court. To remedy this problem, defendants have introduced the engagement letters with the affidavit of David Hegg (dkt. #71), who prepared and signed the challenged letters. Since plaintiff does not challenge Hegg's ability to establish foundation for the letters, defendants have remedied any evidentiary deficiency and plaintiff's motions to strike will be denied.

[2] From the parties' proposed findings of fact and the record, the court finds the following facts to be material and undisputed viewed in a light most favorable to the non-moving party. In situations in which the parties dispute material facts, each parties' version of the facts is set forth and the disputes are identified.

2

place of business in Iowa.  Defendant Bremser, Schommer, & McHugh, CPA's, LLC is a former Wisconsin limited liability company whose members were all citizens and residents of Wisconsin.  In 2003, the members dissolved the LLC and incorporated a successor entity, defendant Bremser Group, Inc.  Defendant Bremser Group, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin.  (For the purpose of deciding these motions, both defendant Bremser, Schommer & McHugh LLC and defendant Bremser Group will be referred to collectively as "Bremser.")  Defendant Philadelphia Indemnity Insurance Company is a Pennsylvania insurance company with its principal place of business in Pennsylvania.  Philadelphia Indemnity is named as a defendant only in its capacity as insurer of Bremser.

## B.  Shullsburg Creamery, Inc.

Non-party Shullsburg Creamery, Inc. was a Wisconsin company specializing in the manufacture and sale of cheese products until it filed for voluntary receivership pursuant to Wis. Stat. ch. 128 in December 2005.  Beginning in approximately 1986, plaintiff American Trust & Savings Bank had a commercial lending relationship with the Creamery and its related entities, Shullsburg Cheese, Inc., SCI Transportation, Inc., SCI Development, LLC and Brewster Enterprises, LLC.  In 1990, Scott Stocker began serving as the Creamery's president.  Stocker has a high school diploma and completed about two years of college.  He has a working knowledge of accounting and financial statements, but hired people to handle

3

the financial aspect of the Creamery's business. Before 1994, the Creamery both produced and distributed cheese. Stocker decided to take the Creamery out of the production side of the business in 1994 because he felt that the company's cheese factories were inadequate and cheesemaking was financially draining the company.

In late 2002 or early 2003, the Creamery retained defendant Bremser to perform accounting services. Stocker was familiar with Bremser's accounting services because Frank Bremser was Stocker's personal accountant. Also in 2002, Stocker, now the only voting shareholder and only director of the Creamery, fired the Creamery's chief financial officer, Grant Russell, in part because Russell failed to provide Stocker with adequate financial information. Stocker hired Dennis Bollhorst as chief financial officer in November 2002.

The parties hotly dispute what role, if any, Bremser played in recommending, screening and hiring Bollhorst as the chief financial officer. American Trust avers that Stocker asked Bremser specifically to screen applicants for the CFO position, while Bremser denies being involved. Also, Bremser avers that it was retained *after* Bollhorst had been hired and that Bollhorst actually hired Bremser on behalf of the Creamery. The parties agree that Bollhorst's performance as CFO was unsatisfactory, leading to his termination in July 2005.

**C. Bremser's Relationship with the Creamery**

After Bremser began working for the Creamery, Stocker became more involved in analyzing the company's finances. Stocker also began communicating more directly with

his accountants than he had in the past. Stocker believed he was getting more accurate financial reporting from Bremser than he had received from the Creamery's preceding accounting firm. Stocker told American Trust that Bremser's "review" of the Creamery's financial statements was like an "audit" because the accountants were checking inventories against invoices and invoices against purchases, although Stocker admits not understanding the difference between a review and an audit.

The parties dispute how often Stocker met with the Bremser accountants and the scope of their meetings. American Trust avers that Stocker met with Bremser quarterly, as part of Bremser's review activities, and discussed many issues with Bremser including accounts payable, accounts receivable, total sales figures, inventory evaluation and the calculation of cost of goods sold. Bremser avers that its accountants met with Stocker "periodically," but not quarterly.

Bremser was retained to review the Creamery's financial statements for the fiscal years ending in January 2003 and January 2004. Pursuant to its engagement letters, Bremser agreed to review the Creamery's balance sheets, statements of income, retained earnings and cash flows for those years and prepare the Creamery's federal and state income tax returns. The engagement letters stated that the review was not an audit and that Bremser would not gain an understanding of the Creamery's internal controls or assess financial risks. Further, the letter stated that the review could not be relied on to disclose errors, fraud, illegal activities or deficiencies in the Creamery's internal controls, but that Bremser would disclose

any material errors, fraud or illegal acts that it discovered.  Finally, the letter stated that Bremser was relying on financial information and statements provided by the Creamery's management to conduct its review, and that it was the responsibility of the management to provide accurate information, maintain adequate internal controls over financial reporting, and safeguard the company's assets.   The Creamery provided these reviewed financial statements to its lender, American Trust, as a condition of the Creamery's loans with American Trust.

Pursuant to specific engagement letters, Bremser was also retained to produce company-wide projections in November 2004 regarding the Creamery's expansion into cheese manufacturing, and to perform a full audit of the Creamery's financial statements for the fiscal year ending in January 2005.

The parties dispute whether Bremser was involved in the Creamery's financial and accounting system beyond the specific engagements discussed above. American Trust asserts that Bremser served as a controller to the Creamery.  In particular, American Trust asserts that because Bremser concluded early in 2003 that Bollhorst was an incompetent CFO, Bremser assumed the role of controller for the Creamery, assured Stocker that it would "fix" the Creamery's accounting system, and became intimately involved in the Creamery's internal accounting system and day-to-day operations.

American Trust also asserts that Stocker retained Bremser to provide a number of additional services.  For example, American Trust maintains that Stocker retained Bremser

to provide ongoing accounting assistance to support CFO Bollhorst, ensure management had accurate financial data, produce quarterly financial statements, implement a functional general ledger accounting system and an internal financial reporting system, investigate a discrepancy in the Creamery's aged cheddar cheese inventory, perform business valuation services for the Creamery and Brewstar Enterprises regarding a potential merger with Swiss Valley Farms, and value the buyout price of the former controller's ownership shares. Bremser denies that it was engaged for any purpose other than to produce reviewed financial statements for the fiscal years 2002 and 2003, projections in 2004, and the audit for fiscal year 2005.

The parties also dispute the accuracy of Bremser's work for the Creamery. American Trust asserts that Bremser manipulated the Creamery's financial statements by entering numerous false transactions in the company's accounting books. In particular, American Trust asserts that Bremser could not balance the Creamery's books for the fiscal year 2002 and so inserted a "plug" of more than $600,000 into the costs of goods sold formulation, falsely inflating the company's income by $600,000. American Trust asserts that Bremser repeated this procedure in 2003, inserting a "plug" of more than $100,000. Both times, Bremser did this without the knowledge or approval of the Creamery's management. Bremser denies making any entries at all into the Creamery's accounting books, let alone false entries.

Bremser charged the Creamery more than $190,000 for its various accounting and

attest services.  The parties dispute how much of the $190,000 was spent on attested reviews and audit.  American Trust says it paid more that 80% for other services, while Bremser says it was significantly less than 80%.

## D.  The Creamery's Expansion and Demise

In 2003, Stocker observed that the Creamery's cash flow had improved. Nevertheless, Stocker was concerned about inadequacies in the level and quantity of its cheese supply, concluding that the Creamery needed to get back into cheese manufacturing if it was to survive long-term.  Stocker believed that the business could only grow with an adequate supply of cheese, that resuming manufacturing was an opportunity to control the costs and supply of quality cheese, and that expansion would open a new revenue stream. He also characterized his decision to open a cheese factory as "an act of desperation" because he felt he needed to "take a chance."  Bollhorst told Stocker that he did not think the Creamery could afford to build a cheese factory and start producing cheese again.  In 2003, however, the Creamery started purchasing cheese making equipment with the intent of building another cheese factory at some point in the future.  Stocker acted in part because of favorable loan interest and depreciation rates.

In October 2004, the Creamery retained an outside consultant, Tim Baye, to prepare projections of the financial impact of the cheese factory.  American Trust alleges that Bremser accountants, including Frank Bremser and David Hegg, counseled Stocker

personally sometime prior to November 2004 regarding the Creamery's expansion and assured him that the Creamery could service new debt for expansion exceeding $5 million. Bremser denies such counseling.

American Trust agreed to finance the Creamery's cheese factory expansion. The documentation for financing was executed October 15, 2004. Before approving the loan, American Trust analyzed the Creamery's January 2003 and January 2004 year-end review financial statements prepared by Bremser, the financial projection prepared by Tim Baye and the June 2004 six-month financial statement prepared by the Creamery's chief financial officer, at that point still Bollhorst. (American Trust asserts that Bremser was also involved in producing the six-month financial statement, but Bremser denies involvement.) American Trust retained the right to rescind its loan agreements if information came to light that cast doubt on the financial viability of the expansion.

In November 2004, Bremser produced financial statements projecting substantial benefit from the Creamery's expansion. In particular, Bremser projected the Creamery's net income for 2005 at $322,416 and equity of nearly $3.3 million, even after borrowing $5.15 million in new debt to finance construction of a new warehouse and cheese manufacturing facility. American Trust asserts that the projections prepared by Bremser were based on reviews that Bremser had conducted previously. Bremser asserts that the projections were based on information provided by Scott Stocker and the Creamery's consultant Tim Baye. Bremser informed the Creamery that reality could be materially different than the

projections because unexpected events and circumstances could arise that would affect the Creamery's financial success.

The Creamery constructed the cheese factory under budget.  However, the cheese factory equipment purchases were $500,000 over budget.  In May 2005, Bremser issued its audited financial statements indicating that the Creamery had sustained a loss of slightly more than $20,000 in 2004.  The parties dispute whether this figure is accurate.  American Trust asserts that this figure is inaccurate, that the Creamery had actually lost more than $1.4 million in 2004, and that Bremser had entered numerous false journal entries to eliminate the loss.  In particular, American Trust avers that Bremser inflated the Creamery's income by purporting to sell the Creamery's entire trucking fleet to a related company, even though the sale never took place.  Bremser denies making any journal entries, denies inflating the Creamery's income, states that any issues related to the sale and transfer of the trucking fleet were the fault of the Creamery's chief financial officer, and states that its audited financial statement was accurate.

In 2005, Stocker hired a new company controller, Carolyn Kuhle, who assumed responsibility for the implementation of the company's general ledger system.  By May 2005, Kuhle began producing contemporaneous financial information online, which indicated that the company was in a financial tailspin and unable to service its debt.  It became apparent that Bollhorst had attempted to increase the Creamery's cash flow by failing to pay several of the Creamery's creditors.  The Creamery hired turnaround specialists

10

to save the company and Stocker invested another $300,000 in the company.  Bremser suggested that the Creamery incur an additional $1.5 million in debt, but no lenders would extend more money.  In November 2005, the Creamery closed the cheese factory.  On December 28, 2005, the Creamery, and its related entities, entered voluntary receivership.

The circuit court for LaFayette County, Wisconsin, appointed Michael S. Polsky as receiver for the Creamery and related entities.  During the receivership, the Creamery's assets were sold and the proceeds were distributed to its creditors, including American Trust.  The proceeds from the sale of assets were insufficient to repay the Creamery's debt obligations, and American Trust received only partial repayment of the money owed to it.


**E.  State Action**

On April 6, 2007, American Trust filed suit in the Circuit Court for Dane County against Bremser Group, Inc., Bremser Schommer & McHugh CPA's LLC, Vaassen Pluemmer, CPA's, LLC[3] and their insurers, alleging professional negligence, negligent misrepresentation and intentional misrepresentation.  (*American Trust* & *Savings Bank v. Philadelphia Indemnity Ins. Co., et al.*, 07-cv-1175).  American Trust alleged that the Bremser entities were negligent in preparing the Creamery's annual reviews for the 2002 and 2003 fiscal years, negligent in preparing the audited financial statement for the fiscal year 2004,

---

[3]  Vassen Pluemmer was an accounting firm that worked with the Creamery prior to Bremser working with the Creamery.  It was dismissed from the state action before trial pursuant to a confidential settlement agreement.

11

and that the annual review and audited financial statement for 2004 prepared by Bremser were false, were misleading, contained intentional misrepresentations, and was not compliant with "generally accepted accounting principles."  American Trust alleged that the annual reviews and audits prepared by Bremser induced the bank to issue millions of dollars in debt financing that the Creamery could not repay.

Bremser was represented throughout the state action by the same law firm that appears for them in this action. The parties engaged in pre-trial discovery in the state action, including more than thirty days of depositions.  Scott Stocker testified in his deposition that a number of factors caused the Creamery to fail, including market conditions, cost overruns, increased shipping and distribution costs, increased interest rates, the failure to lock in milk prices, the failure of the cheesemaking factory, the failure to close the cheesemaking factory soon enough, and the company being over-leveraged and without sufficient cash flow. Bremser moved pursuant to Wis. Stat. § 803.03 to add the Creamery as a necessary party, but American Trust opposed the motion and the court denied it.

A jury trial commenced on October 26, 2009.  During the course of the trial, Bremser offered evidence, proffered witness testimony and presented the opinions of their retained expert on the standard of care for Wisconsin certified public accountants and about the causes of the Creamery's financial problems.  Each of the accountants who worked on the Creamery account testified at trial, including principals Frank Bremser and David Hegg. Trial in the state action lasted seven days and the jury deliberated for nearly twelve hours

before reaching a verdict.  The parties stipulated to a form of the verdict that combined the separate accounting firms as one for the purpose of the jury's fact finding.

On November 3, 2009, the jury returned a verdict in favor of American Trust on all claims.  With respect to American Trust's professional negligence claim, the jury was instructed on the standards for professional negligence but there were no specific references to the Creamery in the instructions.  The jury found that Bremser was negligent and that Bremser's negligence was a cause of damages to American Trust.  The jury also found that American Trust and the Creamery were comparatively negligent, assigning 55% to Bremser, 30% to the Creamery and 15% to American Trust.

With respect to American Trust's misrepresentation claims, the jury found that "the Bremser entities ma[de] an untrue representation of fact . . . based on their personal knowledge or in circumstances in which they necessarily ought to have known the truth or untruth of such representation," "knowing it was untrue or recklessly without caring whether it was true or untrue," and "with the intent to deceive and induce American Trust & Savings Bank to act on it[.]"

Bremser filed motions after the verdict, seeking to set aside the damage award and the jury verdict on American Trust's misrepresentation claims or alternatively for a new trial. The trial court entertained both written and oral arguments on motions after the verdict and denied the defense motions in their entirety.  On January 11, 2010, the trial court entered judgment on the jury's verdict, including on American Trust's strict responsibility

misrepresentation claim.[4]   The defendants appealed the judgment to the court of appeals and

it is currently being briefed by the parties.


**F.  Assignment of Claims**

In April 2009, Michael Polsky, the receiver for the Creamery, entered into an

assignment of claims agreement with American Trust.   Under the agreement, Polsky

transferred and assigned to American Trust all rights, title and interests in any and all claims

the receiver or receivership entities, including Brewer Enterprises, LLP, Shullsburg Cheese,

Inc. and SCI Transportation, may have against third parties, as partial discharge of the

bank's secured claim against the receivership estate.   The circuit court ratified the assignment

of claims by formal order and discharged Polsky from his duties as receiver.   American Trust

brings this action against Bremser in its capacity as assignee of rights and claims from the

Creamery.


OPINION

Plaintiff asserts five legal theories against defendants.   These are: (1) professional

malpractice; (2) negligent misrepresentation; (3) intentional misrepresentation; (4) breach

of contract; and (5) unjust enrichment.   The parties do not dispute that Wisconsin law

---

[4]  American Trust's strict responsibility misrepresentation and breach of fiduciary duty claims
against Bremser were dismissed by this court on January 6 and 26, 2010.  Dkts. #23 and #26.

governs plaintiff's claims. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.")  Both parties have moved for partial summary judgment on plaintiff's first four claims.

## A. Defendants' Motion for Summary Judgment

Defendants contend that American Trust cannot prove Bremser caused any damages to the Creamery.  In order to succeed on these claims, plaintiff must prove that Bremser's acts or omissions were a cause of damages to the Creamery. *Cuene v. Hilliard*, 2008 WI App 85, ¶ 19, 312 Wis. 2d 506, 513, 754 N.W.2d 509, 516 (causation is essential element of misrepresentation claim); *Ramsden v. Farm Credit Servs.of N. Cent. Wis. ACA*, 223 Wis. 2d 704, 720-21, 590 N.W.2d 1, 7-8 (Ct. App. 1998) (same); *DeThorne v. Bakken*, 196 Wis. 2d 713, 717, 539 N.W.2d 695, 697 (Ct. App. 1995) (causation is essential element of malpractice claim); *Hlavinka v. Blunt, Ellis & Loewi, Inc.*, 174 Wis. 2d 381, 400, 497 N.W.2d 756, 764 (Wis. App. 1993) (causation is essential element of breach of contract and negligence claims).  To establish causation on its negligent and intentional misrepresentation claims, plaintiff must show that the Creamery relied on Bremer's alleged misrepresentations in making the business decisions which caused the Creamery's damages. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis. 2d 146, 157, 677 N.W.2d 233, 239 (reliance is essential element of intentional misrepresentation claim); *Ramsden*, 223 Wis. 2d

at 721 (reliance is equivalent to causation element in misrepresentation claims).

In defendants' opening brief in support of summary judgment, they argue that expert testimony is necessary to prove that Bremser was a cause of the Creamery's financial problems and eventual receivership, because such a connection goes beyond the common understanding of a lay juror. Further, defendants contend that plaintiff's expert, Greg Junek, offers no testimony as to causation. Defendants do not explain why an expert would be required to prove causation in this case, and the cases they cite do not establish that an expert on causation is required here. Instead, the cases hold that expert testimony is required to establish causation for technical or scientific matters, but not for cases in which a lay person could understand a causal connection. *See, e.g.*, *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103-04 (S.D. Ind. 2003) (expert testimony required to prove claim that vehicle's air bag failed to deploy completely in accident); *Weiss v. United Fire & Cas. Co.*, 197 Wis 2d 365, 382-83, 541 N.W.2d 753, 759 (1995) (expert testimony not required in all tort actions alleging insurer's bad faith); *Schmaltz v. Norfolk & Western Ry. Co.*, 896 F. Supp. 180, 182-83 (N.D. Ill. 1995) (expert required to show relationship between exposure to herbicide and respiratory illness).

Plaintiff contends that Junek's report addresses causation, but that even if it did not, an expert is not needed to establish causation in this case. The court agrees. A jury could reasonably conclude that Bremser's misrepresentations caused the Creamery's demise, if it credited evidence that (1) the Creamery failed due to an ill-advised cheesemaking expansion

16

and (2) the Creamery relied on false information from Bremser accountants in deciding to expand. In any event, defendants abandon this argument in their reply brief, conceding that a jury is capable of determining causation in this case. Defs.' Reply Br., dkt. #67, at 3.

Defendants' remaining argument is that even if an expert is not required, plaintiff cannot establish that Bremser caused any damages to the Creamery and cannot establish that the Creamery relied on Bremser's conduct and alleged misrepresentations in making the business decisions that eventually led to the Creamery's failure. Defendants ask that this court find that the causation elements of plaintiff's claims cannot be satisfied as a matter of law. The cause of defendants' alleged conduct, however, "is for the jury to determine unless the issue is so clear that reasonable [people] could not differ." *Bruss v. Milwaukee Sporting Goods, Co.*, 34 Wis. 2d 688, 695, 150 N.W.2d 337, 340 (1967); *see also Johnson v. Neuville*, 226 Wis. 2d 365, 378-79, 595 N.W.2d 100, 107 (Ct. App. 1999) ("Causation is a question of fact, and whether causation exists is frequently an inference the trier of fact draws from the circumstances."). In this case, there are genuine factual disputes about causation and, thus, the issue must be presented to a jury.

To prove causation, American Trust must prove that the Creamery's reliance on Bremser's alleged misrepresentations or negligent conduct played a substantial part in the Creamery's business decisions that eventually led to its downfall. *See* Wis. JI–Civil 2401 (2005). The parties agree that it was the Creamery's expansion into cheesemaking that caused the company's ultimate demise. Defendants contend that because Scott Stocker did

not rely on Bremser's financial services in making the decision to expand, the Creamery cannot connect its demise and damages to Bremser's conduct.

First, defendants contend that it would have been impossible for the Creamery to rely on Bremser's advice or projections, because Bremser was not hired to provide business advice and did not provide any projections until *after* the Creamery had made the decision to expand and had obtained financing from American Trust for the project.  Specifically, construction of the cheese factory began in early September 2004, American Trust approved financing for the factory in October 2004, and Bremser did not provide projections to the Creamery and American Trust until November 2004.  In addition, defendants argue, Bremer told the Creamery that the projections were speculative, made only for the purpose of obtaining financing, and may not comport with reality.  Similarly, defendants argue it would have been impossible for the Creamery to rely on the audit for the 2004 fiscal year in making business decisions, because that audit was not produced until May 2005, approximately eight months after construction of the cheese factory began.

Second, defendants contend that Scott Stocker admitted not relying on Bremser in making the decision to open the cheese factory.  Defendants point to Scott Stocker's deposition testimony from the state case, in which Stocker testified about the reasons why the Creamery decided to build a cheese factory.  Stocker did not state specifically that he relied on information provided by Bremser in making the decision to move into cheesemaking, nor did he claim that the Creamery failed because of information provided

or not provided by Bremser.  Instead, Stocker testified that he decided to move into cheesemaking due to concerns about the company's future and favorable loan rates at the time.  Also, Stocker sought advice from his CFO, Bollhorst, and a consultant, Tim Baye. Although Bollhorst advised Stocker against the decision to enter into cheese manufacturing, Stocker forged ahead because he was desperate and had already made up his mind that cheese manufacturing was necessary for the Creamery to survive.  Thus, defendants argue, there is no evidence that the Creamery relied on Bremser in making the ill-fated decision to expand into cheesemaking.

The problem with both of defendants' causation arguments is that they ignore Scott Stocker's affidavit, dkt. #55.  In the affidavit, Stocker avers that the financial reviews prepared by Bremser were "the main source of reliable financial information about the company's financial condition" and that he "relied upon and trusted the financial information, including financial statements and financial projections, produced by the Bremser accountants when making many different business decisions." Dkt. #55, ¶¶ 14, 20. Stocker also states that he "particularly trusted and relied on the financial statements and financial projections produced by the Bremser accountants when making the decision in late 2004 to expand Shullsburg Creamery's operations through the construction of a new cheese factory and warehouse," and that David Hegg and Frank Bremser assured him that the Creamery could sustain new debt exceeding $5 million. *Id.* at ¶¶ 21-22.  Finally, Stocker avers that he would not have authorized the cheese factory expansion had he known (1) the

Bremser accountants had "plugged" the 2002 and 2003 year-end reviews, (2) the Creamery's inventory did not comply with generally accepted accounting principals, and (3) the Creamery was violating its loan agreements. *Id.* at ¶¶ 30-32. In sum, Stocker avers that because of Bremser's misleading financial reviews and advice, Stocker believed that the Creamery was in much better financial shape than it actually was. *Id.* at ¶ 37. If Stocker had known about the Creamery's true financial state, he would not have approved the cheesemaking expansion that eventually caused the Creamery's downfall.

Stocker's affidavit creates a genuine dispute of fact regarding whether the Creamery relied on Bremser's financial services and advice in making the business decisions that eventually caused its demise. While Stocker's state deposition testimony may provide Bremser with material for cross-examination, it is not so inconsistent as to preclude Stocker from testifying consistent with the averments in his affidavits. If a jury ultimately were to believe Stocker's and American Trust's version of events, then that jury could conclude that Bremser provided misleading financial information to the Creamery and the Creamery's creditors *before* the Creamery decided to expand and American Trust's final decision to finance the expansion, or at least before proceeding with the actual expansion. If the jury were to believe Stocker's averments that he relied on the advice and financial information provided by Bremser when making the decision to expand into cheesemaking, then that jury could also infer that Bremser was a substantial factor in causing the Creamery's damages.

While Bremser contends that Stocker's affidavit is misleading, not credible and does

20

not outweigh the contrary evidence in the record, it is up to a jury to decide whether a witness's testimony is credible and whether evidence is sufficient.  In determining whether summary judgment for defendants is appropriate, the court must accept as true all admissible evidence submitted by plaintiff, even if plaintiff's version of events seems less credible or implausible.  *Washington v. Haupert*, 481 F.3d 543, 549 (7th Cir. 2007); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.").  Accordingly, because there are genuine factual disputes related to causation, defendants' motion for summary judgment will be denied.


**B.  Plaintiff's Motion for Summary Judgment**

In its motion for partial summary judgment, plaintiff seeks to preclude defendant from disputing liability on plaintiff's claims for professional negligence, negligent misrepresentation, intentional misrepresentation and breach of contract.  Plaintiff contends that since these issues have already been litigated to judgment in a related state action, the doctrine of issue preclusion forecloses defendants from re-litigating the issues here.

This court applies Wisconsin law to determine the preclusive effect of a Wisconsin state court judgment.  *Simpson v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006) (citing 28 U.S.C. § 1738) ("judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories . . . as they have by law or usage in the courts

21

of such State [or] Territory . . . from which they are taken"); *Stericycle, Inc. v. City of Delavan*, 120 F.3d 657, 658-59 (7th Cir. 1997) ("Federal courts must give Wisconsin judgments the same preclusive effect as would the state courts of Wisconsin."). Pursuant to Wisconsin law, issue preclusion is a question of law committed to the court's discretion, which prevents "relitigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in a prior action and reduced to judgment." *Flooring Brokers, Inc. v. Florstar Sales, Inc.*, 2010 WI App 40, ¶ 6, 324 Wis. 2d 196, 781 N.W.2d 248 (internal citations omitted); *see also Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶¶ 15-17, 281 Wis. 2d 448, 463-64, 699 N.W.2d 54, 61. Moreover, Wisconsin allows the use of non-mutual offensive issue preclusion, meaning that a defendant can be foreclosed from litigating an issue that the defendant previously litigated unsuccessfully in an action with another party. *Michelle T. v. Crozier*, 173 Wis. 2d 681, 698-99, 495 N.W.2d 327, 334-35 (1993); *In re Commitment of Sorenson*, 2001 WI App 251, ¶ 11, 248 Wis. 2d 237, 243-44, 635 N.W.2d 787, 790.

Under Wisconsin law, the court must conduct a two-step analysis to determine whether issue preclusion is applicable. As a first step, the court must inquire "whether issue preclusion can, as a matter of law, be applied." *Rille v. Physicians Ins. Co.*, 2007 WI 36, ¶ 36, 300 Wis. 2d 1, 19, 728 N.W.2d 693, 702. This requires the court to "determine whether the issue of law or fact was actually litigated and determined in the prior proceeding by a valid judgment . . . and whether the determination was essential to that judgment." *Id.* at ¶ 37; *Mrozek*, 2005 WI 73, at ¶ 17. If the answer to these initial questions is "yes", the

22

second step is for the court to "conduct a fairness analysis to determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Mrozek*, 2005 WI 73, at ¶ 17.[5]

The threshold legal question is, therefore, whether the issues that plaintiff seeks to preclude were actually litigated, actually decided and essential to the judgment in the state action. *Flooring Brokers, Inc.*, 2010 WI App 40, at ¶¶ 9-13.  American Trust is seeking issue preclusion on several specific factual and legal issues, including: (1) that the reviewed and audited financial statements prepared by Bremser for the Creamery contain materially untrue representations of fact and that these misrepresentations were made negligently and intentionally; (2) that Bremser failed to meet the standard of care for certified public accountants in Wisconsin when preparing and issuing the reviewed and audited financial statements for the Creamery; and (3) that the Bremser entities breached their contracts with the Creamery to conduct the financial reviews and audit in conformance with applicable

---

[5]  In making the fairness determination, courts consider any of the following factors that are relevant to the situation:

> (1) whether the party against whom preclusion is sought could have obtained review of the judgment; (2) whether the question is one of law that involves two distinct claims or intervening contextual shifts in the law; (3) whether there are apt to be significant differences in the quality or extensiveness of the two proceedings such that relitigation of the issue is warranted; (4) whether the burden of persuasion has shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and (5) whether matters of public policy or individual circumstances would render the application of issue preclusion fundamentally unfair, including whether the party against whom preclusion is sought had an inadequate opportunity or incentive to obtain a full and fair adjudication of the issue in the initial litigation.

*Mrozek, 2005 WI 73, at ¶ 17.*  Factors 1, 2 and 4 are decided as questions of law, while factors 3 and 5 require the court to exercise its discretion.  *Id.*

standards.  As the party asserting preclusion, plaintiff American Trust has the burden to show that these issues were actually decided and essential to the jury's verdict in the state case.  *Paige K.B. ex rel. Peterson v. Steven G.B.*, 226 Wis. 2d 210, 219, 594 N.W.2d 370, 374 (1999); *see also State v. Jacobs*, 186 Wis .2d 219, 226, 519 N.W.2d 746, 749 (Ct. App. 1994) (citing *Dowling v. United States*, 493 U.S. 342, 350 (1990) ("the burden [is] on the [the party seeking preclusion] to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.") Plaintiff has not met that burden.

In the state case, American Trust alleged in its complaint that Bremser was negligent in preparing the financial reviews for the fiscal years 2002 and 2003 and in preparing the audit for fiscal year 2004.  Plaintiff contends that these issues were fully litigated and necessary to the state judgment, because the jury found in favor of American Trust on its claims and the jury specifically found on its verdict form that Bremser was negligent and knowingly made an untrue representation of fact.

A jury's verdict form and instructions may clarify the issues actually decided in a case. 18 Wright, Miller, & Cooper, *Federal Practice & Procedure* § 4420; *State v. Nommensen*, 2007 WI App 224, ¶ 20, 305 Wis. 2d 695, 707, 741 N.W.2d 481, 488.  Even a special verdict, however, may fail to reveal the issues actually decided.  For example, in *Haywood v. Ball,* 634 F.2d 740 (4th Cir. 1980), a jury in the first trial between the parties answered "no," when specifically asked whether the defendant's "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs of the plaintiff?"  But this answer

did not preclude a later determination that defendant was guilty of malicious, wanton and oppressive behavior. *Id.* at 742-43.  The court explained that this is because the first jury might have found deliberate indifference, but answered "no" because plaintiff's medical needs were not serious.  *Id.*

In the state case involving American Trust and Bremser, it is not clear that the jury made specific findings necessary to have the preclusive effect plaintiff now seeks.  For example, it is not clear from the verdict form that the jury in the state case determined that Bremser was negligent in performing *each* of the reviews and the audit.  The questions related to the professional negligence claim on the verdict form asks the jury only:

- Were the Bremser entities negligent? (Answer: Yes)

- Was such negligence of the Bremser entities a cause of damages to American Trust & Savings Bank? (Answer: Yes)

The jury answered "yes" to the negligence question, but the form did not ask the jury to elaborate on Bremser's negligent acts.  Specifically, the verdict form did not ask whether Bremser was negligent in preparing the financial reviews and audit for the Creamery, or whether Bremser was negligent in performing some other accounting function undertaken for the Creamery.  Further, the verdict form did not ask the jury to specify whether Bremser was negligent in preparing the January 2003 or 2004 financial reviews or the January 2005 audited financial statement or some combination of the three.  Likewise, the jury instructions, which merely state the elements of professional negligence generally, say nothing about which of Bremser's actions the jury considered.  Thus, the jury was not

required to decide that Bremser produced *each* financial review or audit negligently in order to answer "yes" to the question regarding negligence.

It is also impossible to determine which issues were "actually decided" with respect to American Trust's misrepresentation claims.  In the state case, American Trust alleged that Bremser made misrepresentations of fact in its financial reviews by failing to disclose that (1) the financial statements were not in conformity with generally accepted accounting principles; (2) a $508,000 inventory write-down; (3) an "off the books" cheese inventory; (4) improper inventory management and reporting; and (5) violations of the loan agreement with American Trust.  American Trust also alleged that Bremser made misrepresentations of fact in its financial review by (1) falsely inflating inventory to reduce the Creamery's operating losses, (2) falsely inflating the Creamery's assets, and (3) failing to disclose related-party sales, the Creamery's status as insolvent and violations of the loan agreements.

The questions on the verdict form related to negligent misrepresentation ask only:

- Did the Bremser entities make an untrue representation of fact? (Answer: Yes)

- Were the Bremser entities negligent in making such representation? (Answer: Yes)

- Did American Trust & Savings Bank believe such representation and rely on it? (Answer: Yes)

- Was American Trust & Savings Bank negligent in relying? (Answer: No)

Similarly, the questions related to strict and intentional representation ask:

26

- Did the Bremser entities make an untrue representation of fact? (Answer: Yes)

- Did the Bremser entities make the representation based on their personal knowledge or in circumstances in which they necessarily ought to have known the truth or untruth of such representation? (Answer: Yes)

- Did the Bremser entities make such representation knowing it was untrue or recklessly without caring whether it was true or untrue? (Answer: Yes)

- Did the Bremser entities make such representation with the intent to deceive and induce American Trust & Savings Bank to act on it? (Answer: Yes)
- Did American Trust & Savings Bank believe such representation to be true and justifiably rely on it to its financial damage? (Answer: Yes)

As with the negligence claim, it is impossible to determine which of the several alleged misrepresentations made by Bremser the jury determined to be untrue representations of fact. In addition, the instructions provided to the jury were merely pattern instructions with no reference to specific misrepresentations allegedly made by Bremser. Thus, although the jury may have concluded that Bremser made every untrue representation of fact alleged by American Trust, it is possible that the jury found that Bremser only failed to disclose that the Creamery was in violation of its loan agreement and, thus, made "*an* untrue representation of fact." Even if the jury concluded that Bremser's failure to disclose the Creamery's loan agreement violations was the only misrepresentation that Bremser made, the jury could answer "yes" to all of the relevant questions on the verdict form in the state suit.

27

In sum, the form of the verdict and jury instructions in the state case make it extremely difficult to determine the specific issues of fact or law that were actually litigated and essential to the verdict in the state case, other than that specifically decided: Bremer was negligent in preparing statements and made untrue statements upon which American Trust reasonably relied to its detriment.

The jury may well have believed that Bremser was negligent and included misrepresentations in each of the financial reviews and the audit it produced for the Creamery.  The test to apply issue preclusion, however, does not "focus[] on what the jury *might* have decided"; rather, it focuses on "what the jury *must* have decided in order to reach its decision."  *Jacobs v. Marathon County, Wis.*, 73 F.3d 164, 168 (7th Cir. 1996) (emphasis in original) (holding that doctrine of issue preclusion did not bar prosecution for kidnapping even though jury had acquitted petitioner of first degree murder on the same facts because "jury could rationally have based its decision on the question of proof of an intent to kill, rather than on the question of [petitioner's] participation in the events"); *see also Jacobs*, 186 Wis. 2d at 226-27 (same).

Through its motion for partial summary judgment, plaintiff seeks to preclude all discussion of liability at trial in this case and focus solely on the issues of causation and damages to the Creamery.  But without knowing what the jury found, issue preclusion cannot apply.  18 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4420, at 516 ("The first rule for identifying the issues to be precluded is that if there is no showing as to the

issues that were actually decided, there is no issue preclusion."); *Ellifson v. West Bend Mut. Ins. Co.*, 2008 WI App 86, ¶ 12, 312 Wis. 2d 664, 672,  754 N.W.2d 197, 201 ("Issue preclusion  can be applied *only* if [the] first step [of the preclusion analysis] is satisfied.") (emphasis in original).  A jury in this case must decide the exact acts that Bremser performed negligently and the exact representations of fact made by Bremser that were false to determine whether negligent acts or misrepresentations by Bremser were reasonably relied upon by or caused damage *to the Creamery*.  Unfortunately, neither the special verdict form or the jury instructions from the state case provide this information.  Without a clear understanding of the issues actually decided in the state case, the first step of the preclusion analysis fails.

Other courts facing ambiguous jury verdicts or court decisions have reached the same conclusion.  *See, e.g.*, *State v. King*, 2010 WI App 19, ¶¶ 8-9, 323 Wis. 2d 277, 779 N.W.2d 724 (unpublished) (holding that issue preclusion did not bar subsequent prosecution for solicitation where jury verdict did not specify its finding leading to the acquittal for conspiracy); *Novartis Pharmaceuticals Corp. v. Abbott Labs.*, 375 F.3d 1328, 1332-34 (Fed. Cir. 2004) (finding issue preclusion inapplicable where jury verdict finding noninfringement of patent did not require jury to specify its rationale for verdict or explain why product was not infringing); *NextWave Personal Communications, Inc. v. F.C.C.*, 254 F.3d 130, 147-49 (D.C. Cir. 2001) (holding that certain issue not precluded because  it was "uncertain whether the issue was actually and necessarily decided in [the prior] litigation"); *Chew v. Gates*, 27 F.3d

1432, 1437-39 (9th Cir. 1994) (no issue preclusion where basis for jury's damage award was unclear); *Mitchell v. Humana Hospital-Shoals*, 942 F.2d 1581, 1582-84 (11th Cir. 1991) (issue preclusion inapplicable to retaliatory discharge case where state court did not explain reason for decision denying unemployment benefits to plaintiff).

Finally, even if issue preclusion could be applied "as a matter of law," the "individual circumstances [of this case] would render the application of issue preclusion fundamentally unfair." *Mrozek*, 2005 WI 73, at ¶ 17.  As noted above, it would be unfair to instruct a jury in the present case that Bremser was negligent and made untrue representations of fact with respect to each financial report and audit it produced.  In an effort to give some preclusive effect to the state jury verdict, the court could craft an instruction to the jury that it must find Bremser negligent with respect to *some* action and made *some* statement that was an untrue representation to American Trust.  However, such an instruction would be highly prejudicial because a jury would likely assume that if Bremser was negligent and made an untrue representation, it is at least partially responsible for the Creamery's failure.  This might be an improper assumption.

Had American Trust asserted a straight forward claim of liability on behalf of the Creamery which derived directly from the state court finding of Bremser's negligence or misrepresentation, perhaps an instruction could be fashioned directing the jury that American Trust would not have provided financing to the Creamery but for Bremser's negligence.  After all, the state court jury found the Bremser entities 55% negligent for the

30

damages caused American Trust, while the Creamery was found only 30% responsible and American Trust 15%, and the jury awarded American Trust $2.6 million in lost loan principal.  With that instruction, American Trust would still have to prove the Creamery would not have gone forward with its various expansion efforts but for American Trust's agreement to provide financing or approve the reviews and audit attested to by Bremser.

But American Trust's complaint does not even hint at such a claim, alleging far more expansive liability and damage theories arising out of the Creamery's reliance on Bremser's work.  Similarly, the affidavit of Scott Stocker -- which American Trust offers in opposition to defendants' motion for summary judgment on causation -- contains no assertions that American Trust drove the Creamery's actions.  Indeed, there is little mention of American Trust playing a meaningful part in Stocker's decisionmaking, except to the extent that (1) he generally met with Jeff Vorwald "on a regular basis to discuss and analyze Schullsburg Creamery's financial performance," (2) he told Vorwald that the January 2003 review was "more like an audit," and (3) he was never informed that the Creamery "had violated loan agreements with American Trust."

Moreover, the allegations of reliance in the complaint and in Stocker's affidavit all concern the Creamery's direct reliance on the negligence, misrepresentation and misstatements by Bremser.  Whether this reflects American Trust's desire for more expansive damages, or the conclusion that only damages directly caused by the Creamery's reliance on Bremser's work are recoverable, American Trust seems to have abandoned any kind of straightforward theory of recovery based on Bremser's negligent acts and misrepresentations

31

that impacted American Trust.  Accordingly, it would be unfair to defendants and unduly confusing to the jury here to introduce a general and ultimately irrelevant finding by a state court.

Unlike the state case, where the jury considered only whether Bremser was responsible for American Trust's lost loan proceeds, the focus of this case is the relationship between Bremser and the Creamery, and involves consideration of the Creamery's involvement in its own financial affairs, its knowledge of Bremser's actions and independent economic conditions that may have contributed to the Creamery's downfall.  As a result, the risk of unfair prejudice that might result from an attempt to apply issue preclusion in this case is too great.  Accordingly, American Trust's motion for partial summary judgment on the grounds of issue preclusion will be denied.

## ORDER

IT IS ORDERED that

1.   Plaintiff American Trust & Savings Bank's motions to strike portions from the affidavit of Clifford Joe Cavitt, dkts. #56 and #64, are DENIED.

2.   The motion for partial summary judgment, dkt. #39, filed by defendants Philadelphia Indemnity Insurance Co., Bremser, Schommer & McHugh, CPA's, LLC and Bremser Group, Inc. is DENIED.

3.   The motion for partial summary judgment, dkt. #33, filed by plaintiff is DENIED.

Entered this 22nd day of September, 2010.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge

32